CARPENTER PAPER COMPANY OF NEBRASKA, APPELLANT, V. LAKIN
MEAT PROCESSORS, INC., AND CHARLES E. LAKIN, APPELLEES.

435 N.W.2d 179

Filed February 10, 1989.   No. 87-134.

Monte Taylor, of Taylor, Connolly & Kluver, and Carolyn A. Rothery for appellant.

W. Patrick Betterman and Mary Lou Perry, of Zweiback, Flaherty, Betterman & Lamberty, P.C., for appellees.

HASTINGS, C.J., GRANT, and FAHRNBRUCH, JJ., and HENDRIX and OLBERDING, D. JJ.

HASTINGS, C.J.
Plaintiff, Carpenter Paper Company of Nebraska, brought

this action in equity against defendants, Lakin Meat Processors, Inc., and Charles E. Lakin, seeking to set aside as a fraudulent conveyance an assignment to Lakin of the proceeds from the sale of substantially all of Lakin Meat's assets and to pierce the corporate veil to hold Lakin personally liable for a judgment debt of the corporation. Following trial to the court, both causes of action were ordered dismissed. Carpenter Paper appeals from the judgment of the district court.

Plaintiff's eight assigned errors may be summarized as follows: The court erred (1) in failing to find that the assignment of assets from Lakin Meats to Lakin to repay loans made to the corporation constituted a fraudulent conveyance and (2) in failing to permit the corporate veil to be pierced in order to hold Lakin personally liable for the debts of the corporation.

A creditor's action to declare a conveyance fraudulent invokes the equity jurisdiction of a trial court. *Brown v. Borland*, 230 Neb. 391, 432 N.W.2d 13 (1988); *Gifford-Hill & Co. v. Stoller*, 221 Neb. 757, 380 N.W.2d 625 (1986).

Proceedings seeking disregard of the corporate entity, that is, seeking to pierce the corporate veil to impose liability on a shareholder for a corporation's debt or other obligation, are equitable actions. *Southern Lumber & Coal v. M. P. Olson Real Est.*, 229 Neb. 249, 426 N.W.2d 504 (1988).

On appeal to this court, an equity action is reviewed de novo on the record, subject to the rule that where credible evidence is in conflict, the Supreme Court may consider the fact that the trial court observed the witnesses and accepted one version of the facts over another. *Obermeier v. Bennett*, 230 Neb. 184, 430 N.W.2d 524 (1988).

Lakin Meat was incorporated in the fall of 1975. Throughout the existence of the corporation, Lakin, who grew up on a farm near Emerson, Iowa, was the president and either the sole shareholder or the majority shareholder. Although the corporation was capitalized at $100,000, there is no indication that any more than $75,000 was paid. However, during the course of the operation of the business, Lakin made personal loans to the corporation on a regular basis at 10 percent interest. The loan balance reached the sum of $1/2 million in May of 1979

and rose to balances over $1 million by December 1979. The loan balance was reduced to $37,642.60 by May of 1982. The business of Lakin Meat was the purchase, slicing, packaging, and sale of beef livers to retail outlets.

The original debt of Lakin Meat to Lakin and all subsequent advances were covered at all times by a security interest in all the tangible and intangible personal property of Lakin Meat, including furniture, machinery and equipment, inventory, accounts receivable, and notes. Lakin's security interest was perfected by the filing of a financing statement in the office of the Douglas County clerk on June 14, 1976.

Lakin has been involved in Charles E. Lakin Enterprises and various other sole proprietorships and corporations. Lakin Meat maintained a checking account in its name with the Emerson State Bank in Emerson, Iowa. Lakin also maintained a checking account in the name of Charles E. Lakin with the American National Bank in Omaha, Nebraska. The American National account was used as a "sweep account." As checks were received by some of Lakin's various businesses, including Lakin Meat, the checks were deposited into the American National account.

For every business except Lakin Meat that used the American National account, the exact amount of deposited money would be transferred out of the American National account into the correct account within a few days of receipt. When Lakin Meat needed to have money transferred from the American National account to the Emerson account, someone from Lakin Meat would call the Emerson State Bank and the bank would deposit into Lakin Meat's account a no-signature check on the American National account in the amount requested. Lakin Meat's money was always transferred in round numbers, rather than in the exact amount paid to Lakin Meat, and deposited in the American National account. The claimed purpose of this arrangement was to permit quicker clearance of the checks written to Lakin Meat by its customers.

Lakin Meat had its own place of business, had its own employees, and had a separate office within the Lakin Building for accounting and bookkeeping work. In addition, Lakin Meat had its own letterhead, had its own phone listed under its

own name, and used its own invoices. Checks from customers for accounts receivable were received in the name of Lakin Meat. Lakin Meat had a separate checking account in its own name. Lakin Meat kept a corporate minutes book, kept its books and records separate from the books and records of Lakin's other business entities, and filed separate tax returns.

In March 1981, Lakin Meat sold substantially all of its assets to Prime Meat Processors. Prime Meat agreed to pay $450,000 for Lakin Meat's fixed assets and to buy Lakin Meat's inventory and supplies for cost. In order to transfer Lakin Meat's assets to Prime Meat free and clear of all liens and encumbrances as required by the agreement, Lakin had to consent to the sale so that his security interest would be released. Lakin agreed to give such consent if Lakin Meat would grant him a new security interest in all remaining assets and transfer all proceeds of the sale to him. The agreement was filed in the office of the county clerk for Douglas County on April 15, 1981.

At the closing of the sale, Prime Meat executed and delivered a $450,000 promissory note for the fixed assets and a $196,709.37 promissory note for the inventory. Lakin Meat endorsed the two notes to Lakin.

At the time of the sale, Lakin Meat owed Lakin $1,016,451.11: $853,000 in principal and $163,451.11 in accrued interest. After the sale, Lakin made additional loans to Lakin Meat in the principal amount of $271,500. Subsequently, Lakin Meat made payments of principal and interest to Lakin in the amount of $1,252,766.04, leaving indebtedness in the principal amount of $37,642.60 plus interest. At trial both Lakin and Thomas Pribil, an assistant to Lakin in the management of his various businesses and the owner of 10,000 shares of the stock of Lakin Meat, testified that at the time Lakin Meat made payment on the debt to Lakin, it was believed Lakin Meat had sufficient funds from which to pay off all creditors. According to these witnesses, it was not until May of 1981, when one of Lakin Meat's accounts receivable in the approximate sum of $75,000 proved to be uncollectible, that Lakin Meat was unable to meet the demands of all its creditors.

Carpenter Paper was one of Lakin Meat's creditors. Out of the hundreds of transactions between the two parties in which,

normally, Lakin Meat always paid its accounts in time to receive the regular discount, a dispute arose over five invoices dated July 9, 1979, March 31, 1980, February 19, 1981, March 3, 1981, and March 10, 1981. On the four invoices other than the one dated March 31, 1980, Carpenter Paper claimed Lakin Meat improperly took discounts for prompt payment (apparently totaling some $30) and, therefore, did not pay enough. On the invoice dated March 31, 1980, Lakin Meat refused to pay that portion of the invoice relating to printed liver film which Lakin Meat claimed was defective. Lakin Meat apparently did pay something in excess of $900 on that particular invoice, but the disputed item which was not paid was approximately $5,900. Sometime after the sale of the assets to Prime Meat, Carpenter Paper commenced suit against Lakin Meat in the district court for Douglas County to recover on the disputed amount. On July 7, 1982, Carpenter Paper obtained a default judgment against Lakin Meat in the principal amount of $5,923.28. Unable to find assets of Lakin Meat with which to satisfy its judgment, Carpenter Paper brought the action which is the subject of this appeal.

We find it unnecessary to discuss Carpenter Paper's claim concerning an assignment in fraud of creditors for the reason that we conclude from a de novo review of the record that Lakin Meat was a mere corporate shell, an alter ego of Charles E. Lakin, and we must therefore disregard the corporate entity.

When a corporation is or becomes the mere alter ego, or business conduit, of a person, it may be disregarded. *J. L. Brock Bldrs., Inc. v. Dahlbeck*, 223 Neb. 493, 391 N.W.2d 110 (1986).

> "Some of the factors which are relevant in determining to disregard the corporate entity" on the basis of fraud are: "(1) Grossly inadequate capitalization; (2) Insolvency of the debtor corporation at the time the debt is incurred; (3) Diversion by the shareholder or shareholders of corporate funds or assets to their own or other improper uses; and (4) The fact that the corporation is a mere facade for the personal dealings of the shareholder and that the operations of the corporation are carried on by the shareholder in disregard of the corporate entity."

*Id.* at 498, 391 N.W.2d at 115, quoting *United States Nat. Bank of Omaha v. Rupe*, 207 Neb. 131, 296 N.W.2d 474 (1980).

Lakin Meat was a subchapter S corporation. Its gross receipts grew to $5 million by fiscal yearend February 29, 1980. Dividends of $200,000 were paid to Lakin in December of 1976 and of $98,000 in May of 1978. The capital was never increased.

Laurence Lanphier, Jr., a C.P.A., testified for the plaintiff and based his testimony on a study done by Robert Morris & Associates. According to Lanphier, in determining adequate capitalization of corporations, he found that as to the ratio of assets to debt, the corporations in the upper quartile of the Robert Morris study would have a ratio of 2.7 to 1, the middle quartile 1.8 to 1, and the lower quartile 1 to 1. Lakin Meat, in 1976, had a ratio of .65 to 1. Using the debt to net worth test, he said that corporations in the upper quartile would normally be found to have such a ratio of .6 to 1 and those in the lower quartile 5.1 to 1. Lakin Meat had a ratio of 7.32 to 1. Based on these tests, it was his opinion that Lakin Meat was thinly capitalized. However, on cross-examination, he gave the opinion that it was grossly inadequately capitalized based on the fact that it ran an overdraft of $100,000 in the bank for 6 years.

William Sweet and Pribil, witnesses for the defendants, simply stated that in their opinion the capitalization was adequate.

Concerning the matter of insolvency, there appear to be two different types of insolvency: equity insolvency, when an entity is unable to currently meet its obligations; and bankruptcy-type insolvency, where the fair value of the assets is exceeded by the amount of its debt. Lanphier gave as his opinion that Lakin Meat was insolvent in the equity sense from its inception down to the final sellout and insolvent in the bankruptcy sense from February 1980 to the end. Opinion testimony of defendants' two witnesses was to the contrary.

It is true that during the life of Lakin Meat, it apparently was able to and did pay all of its creditors on a regular basis except for the default involving Carpenter Paper. However, Lanphier apparently took into consideration that at all times, beginning in 1978, Lakin held notes payable on demand in amounts

varying from $214,000 to over $1 million. This was the result of approximately 225 separate cash advances made by Lakin over the course of 3 years, one advance being as large as $340,000. In the event that Lakin at any time during that 3-year period would have called these notes, Lakin Meat would have been unable to pay them.

Other than the two dividends totaling almost $300,000, and, of course, the final payoff in excess of $1 million, there was no evidence of diversion of corporate funds or assets to Lakin's own use.

In spite of defendants' claims of separate names, bank accounts, office addresses, loans, security interests, etc., the fact remains, readily apparent from an examination of this record, that Lakin Meat was Charles E. Lakin. He controlled the corporation's every move. He ran it as he saw fit. The claimed separate identity was simply a series of complicated and innovative books and accounts. There was a unity of interest as far as Lakin and Lakin Meats were concerned, contrary to the factors in *J. L. Brock Bldrs., Inc. v. Dahlbeck*, 223 Neb. 493, 391 N.W.2d 110 (1986). The separate entity concept of the corporation may be disregarded where the corporation is a mere shell, serving no legitimate business purpose, and is used as an intermediary to perpetuate fraud on the creditors. Lakin's manipulations of the business permitted him to, and he did, terminate the corporation for his own financial well-being to the prejudice of the corporation's creditors.

The judgment of the district court is reversed and the cause remanded for further proceedings consistent with this opinion. Costs are taxed to the appellee Charles E. Lakin.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.